Egan Jr., J.P.
Appeal from an order of the Supreme Court (Lebous, J.), entered February 8, 2016 in Broome County, which partially denied defendants’ motion for summary judgment dismissing the complaint.
At approximately 5:00 p.m. on November 16, 2010, defendant Stephen James Kizale was operating a Ford F-450 bucket truck owned by his employer, defendant Time Warner Entertainment Company, LP, northbound on State Route 201 in the Village of Johnson City, Broome County in the pouring rain when he encountered numerous motor vehicle accidents. According to Kizale, as he attempted to change lanes “to provide ... a cushion of safety on the passenger’s side of [his] vehicle,” a Dodge Durango operated by plaintiff Elizabeth A. Moat *1309 “came alongside [him] at a high rate of speed.” As the two vehicles passed one another, “the rear tire of [Moat’s] vehicle clipped the lug nuts of the driver’s side front wheel of [Kizale’s] truck,” causing Moat to sustain a flat tire. Although Moat offered a contrary version of the accident, claiming that Kizale abruptly changed lanes, striking her vehicle and pinning it against the center guardrail, neither Moat nor Kizale were ticketed, and each left the scene without seeking medical attention.
The day before the accident, Moat, who previously had undergone two surgeries on her lumbar spine and suffered from a variety of medical issues,[1] presented at the office of her treating neurosurgeon, Khalid Sethi, complaining of “severe and bitter back pain.” More than two years (and multiple surgeries) later, Moat and her husband, derivatively, commenced this action alleging that she had sustained a serious injury within the meaning of Insurance Law § 5102 (d) as the result of defendants’ negligence. Following joinder of issue and discovery, defendants moved for summary judgment dismissing the complaint — contending, among other things, that Moat’s various complaints relative to her lumbar and cervical spine predated the November 2010 motor vehicle accident and that the accident neither caused nor exacerbated such ailments. Supreme Court granted defendants’ motion as to plaintiffs’ claim under the 90/180-day category of serious injury, but denied the balance of the requested relief, finding questions of fact as to whether the subject accident either caused new injuries and/or exacerbated Moat’s preexisting spinal conditions. This appeal by defendants ensued.
Plaintiffs, as set forth in their responses to defendants’ various demands for bills of particulars, contend that Moat has sustained a serious injury within the meaning of Insurance Law § 5102 (d) under the permanent loss, permanent consequential limitation and/or significant limitation of use categories. Specifically, plaintiffs rely — in large measure — upon the following injuries/conditions: “a left L4-5 and L5-S1 disc herniation with compression of the L5-S1 nerve roots” and “a large right posterolateral C6-7 disc herniation with C7 nerve root and moderate spinal cord compression” (resulting in permanent or significant loss of range of motion in her lumbar and cervical spine), as well as a permanent or significant left foot *1310 drop, antalgic gait, inability to stand/walk/sit upright for more than 15 minutes, climb stairs, handle or finger objects with her upper extremities and/or return to work. According to plaintiffs, each of the aforementioned conditions was either caused or exacerbated by the November 16, 2010 motor vehicle accident.
As the proponents of the underlying motion for summary judgment, “defendants bore the initial burden of establishing with competent medical evidence that [Moat] did not suffer a serious injury as a result of the accident” (Jones v Marshall, 147 AD3d 1279, 1281 [2017] [internal quotation marks and citation omitted]; see Clausi v Hall, 127 AD3d 1324, 1325 [2015]; see also Martin v LaValley, 144 AD3d 1474, 1475-1476 [2016]). In support of their motion, defendants tendered, among other things, plaintiffs’ examination before trial testimony and responses to defendants’ demands for bills of particulars, Moat’s medical records, hospital admissions and imaging studies and an affidavit and report from their expert, orthopedic surgeon David Hootnick. To that end, the record makes clear that Moat’s well-documented complaints of chronic back pain predate the subject motor vehicle accident by more than five years. In August 2005, Moat presented at a local hospital emergency room with “excruciating low back pain . . . radiating into both legs” and a claimed ability to stand, sit, walk or lie down for only “short periods of time”; Moat attributed the onset of her back and leg symptoms to childbearing. An August 13, 2005 MRI of Moat’s lumbar spine revealed a “[m]oderate central L3-4 disc protrusion with significant mass effect on the thecal sac,” characterized by Sethi (who evaluated Moat in the emergency room) as a “a relatively large central disc herniation at the L3-4 level,” and an office note bearing that same date reflects that Moat walked “with a slow antalgic gait.” Sethi referred Moat to a pain management center, and the records from a September 2005 evaluation indicate that Moat presented with a “[m]arkedly antalgic gait,” pain so severe that she could not “walk, stand or sit for . . . more than a few minutes” and a range of motion “restricted to only a few degrees in each direction.”
When Moat failed to respond to conservative treatment, Sethi performed “a lumbar laminectomy at L3-L4 on the left” in December 2005. Although both Moat and Sethi considered the surgery to be successful and a September 2007 MRI showed no evidence of “residual/recurrent disc herniation,” Moat’s symptoms “waxed and waned” following this procedure; she continued to experience both pain and a limited range of motion, and “[m]ulti[-] level small disc protrusions” were noted on *1311 the imaging study. Moat’s subsequent emergency room visits in January 2009 and March 2010 disclosed complaints of “back of head headache, neck stiffness, shoulder pain and blurred vision,” a history of migraine headaches, “intermittent low back pain,” “[t]enderness around [the] cervical C5-C6” level and an inability to “move her hands.” Similar symptoms were reported during April 2010 physical therapy sessions, wherein Moat related a history of “a back ache from her tailbone all the way up to her head as well as a migraine.”
In August 2010, Moat, who was receiving oxygen around the clock for her pulmonary issues, tripped and fell over her oxygen cannula — prompting a trip to the emergency room with a complaint of “significant low back and left leg pain.” A CT scan conducted in the emergency room showed “[significant disc herniation at the L3-L4 and L4-L5 levels,” in addition to a “diffuse disc bulge as well as central disc protrusion causing mild spinal canal stenoses” at the L5-S1 levels. An MRI of Moat’s lumbar spine was conducted on August 13, 2010, and the results were compared to a similar study undertaken in September 2007. Although “slightly progressive reactive endplate changes” were noted at several levels — “predominantly at L4-5 to the left which [had] progressed since 2007”— and “disc protrusions at multiple levels” were observed, the final impression indicated that the “[d]isc bulging at L4-5 and L5-S1 [was] unchanged without significant stenoses.” Moat failed to respond to treatment, however, and, on August 17, 2010, Sethi performed “[l]eft L4-L5 and L5-S1 hemilaminoto-mies with microdiscectomy.” Moat’s pre- and post-operative diagnoses were the same — “[s]evere left L5-S1 radiculopathy with partial foot drop” and “[h]erniated nucleus pulposus at L5-S1, left, with mass effect on the L5 nerve root.”
On November 15, 2010, one day before the motor vehicle accident at issue, Moat was seen by a physician’s assistant in Sethi’s office, at which time Moat complained of “severe and bitter back pain that [could] come and go at any time and [would] get worse throughout the day.” According to the history provided, Moat was “quite miserable because of the back pain and [was] looking for some relief.” An MRI was ordered, and Moat was scheduled to return to Sethi’s office in four to six weeks; the assessment set forth in the office records stated, in relevant part, “[p]artial foot[ ]drop improving” with “[fincreas-ing low back pain over the last month.”[2] The requested MRI was performed on November 24, 2010, at which time the disc *1312 bulges and protrusions at L3-L4 were “reidentified” and the prior surgical procedures at “L4-L5, left” and “L5-S1, left” were noted. According to the MRI report, the final impression was multi-level degenerative disc disease.[3] A subsequent MRI performed on January 3, 2011, however, disclosed “a new large left posterolateral L5-S1 disc herniation . . . with SI nerve root compression,” as well as “[a] new moderate left paracentral left L4-5 disc protrusion . . . with moderate mass effect on the thecal sac.” Sethi thereafter performed five additional surgeries upon Moat following the accident — a “redo” of the L4-L5 and L5-S1 hemilaminectomy and microdisectomy (January 5, 2011), a trial placement of a dorsal column stimulator in Moat’s lumbar spine (July 14, 2011), the permanent placement of a dorsal column stimulator (July 27, 2011), an anterior cervical disectomy (May 28, 2013) and an L4-L5 and L5-S1 spinal fusion (November 19, 2013).
Following an extensive review of Moat’s medical records and a physical examination conducted on June 18, 2014, Hootnick issued a detailed report wherein he opined that, among other things, Moat’s long-standing “complaints regarding her spine and extremities . . . have no objective or organic basis”; rather, according to Hootnick, Moat’s continued “physical complaints suggest florid symptom magnification” that is “consistent with malingering” and suggestive of “a major psychiatric disorder, Von Munchausens syndrome.” Citing the initial post-accident MRI study, which revealed multi-level degenerative disc disease, Hootnick concluded that Moat “experienced no additional lumbar disc pathology related to the motor vehicle accident . . . prior to [November 24, 2010]” — finding instead that Moat’s lumbar spine issues were the product of preexisting and degenerative conditions. Hootnick reached a similar conclusion relative to Moat’s cervical spine complaints, finding that the degenerative changes noted at C6-7 were “of a non-acute nature.” Finally, upon reviewing all of Moat’s records and imag *1313 ing studies and taking into account, among other things, her underlying history of fibromyalgia and her post-accident return to work,[4] Hootnick was of the view that none of Moat’s post-accident surgeries were necessitated by the November 2010 motor vehicle accident.
Such proof, in our view, was more than sufficient to discharge defendants’ initial burden on their motion for summary judgment. Indeed, Moat’s prior and long-standing complaints of lumbar and, to a lesser extent, cervical pain, her antalgic gait and limited range of motion and her two pre-accident lumbar spine surgeries “reflect a documented history of extensive preexisting conditions and injuries that have produced the same types of symptoms that [she] now attributes to the subject accident” (Dudley v Imbesi, 121 AD3d 1461, 1462 [2014]; see Franchini v Palmieri, 307 AD2d 1056, 1056-1057 [2003], affd 1 NY3d 536 [2003]). Accordingly, the burden shifted to plaintiffs to raise a question of fact as to whether the serious injuries claimed were caused or exacerbated by the underlying accident.
Once the defendant establishes that the plaintiff suffers from a preexisting condition, the “plaintiff must provide objective medical evidence distinguishing [the identified] preexisting condition from the injuries claimed to have been caused by the instant accident” (Shea v Ives, 137 AD3d 1404, 1405 [2016] [internal quotation marks, brackets and citations omitted]; see Dudley v Imbesi, 121 AD3d at 1462). Before addressing the medical evidence offered by plaintiffs, however, we cannot help but note that Moat’s recitation of her injuries, as well as the claimed severity thereof, frequently is at odds with other evidence in the record. For example, Moat’s assertions that her pre-accident low back pain was “resolved with surgical intervention,” which worked “[b]eautifully,” and that she “wasn’t in severe pain” prior to the accident are belied by the narrative of her November 15, 2010 visit to Sethi’s office, which reflects that she presented complaining of “severe and bitter back pain” that had been increasing “over the last month.” Similarly, Moat maintained that, following the accident, her resulting pain prevented her from functioning as “a human being” but, as noted previously, her employment records reflect that she resumed working for her employer from October 13, 2011 through December 2012; additionally, her school records *1314 indicate that she attended classes at a local business institute on a regular basis from October 2010 through February 2012— albeit with certain extended absences. Finally, Moat’s claim that she was “very active prior to the accident” is contradicted by her pre-accident disability leave, as well as her prior reported history of, among other things, back pain, severe asthma, chronic obstructive pulmonary disease and chronic sarcoidosis, the latter of which — according to Moat — resulted in a loss of 80% of function in the lower lobes of her lungs and her corresponding need for supplemental oxygen.
Turning to the specific medical proof offered in opposition to defendants’ motion, plaintiffs tendered affidavits from orthopedic surgeon Herbert Sherry and neurosurgeon David Storrs, both of whom opined that Moat had suffered an exacerbation of her preexisting degenerative disc disease of the lumbar spine that, in turn, was causally related to the November 16, 2010 accident. Although defendants challenge the sufficiency of those opinions relative to Moat’s lumbar spine, this issue need not detain us, as the affidavit tendered by Sethi was sufficient to raise a question of fact as to whether Moat sustained a serious injury in this regard.
Sethi opined that the disc protrusion noted at the L4-5 level on the November 2010 MRI was a new finding compared to the results of Moat’s August 2010 MRI and, further, that the disc bulges and/or protrusions observed on the November 2010 study were at variance with what he actually observed during the course of Moat’s August 2010 lumbar spine surgery, “where good decompression was seen from L4 through SI.” Additionally, Sethi noted that Moat presented at a December 2010 office visit with “a markedly antalgic gait,” which was in stark contrast to the “normal” gait observed during her November 15, 2010 office visit. Moreover, Sethi reported that, during his January 2011 “redo” of the hemilaminotomy and microdisec-tomy at the L4-L5 and L5-S1 levels, he saw that “the prior hemilaminotomy was now in a defective state,” which, in his opinion, was the direct result of the trauma sustained during the course of the November 2010 motor vehicle accident. Hence, Sethi concluded, the subject accident “was a substantial factor in causing a significant aggravation of [Moat’s] preexisting degenerative disc disease in [her] lumbar spine.” As defendants correctly point out, Moat displayed similar physical symptoms and was subject to similar physical limitations both before and after the accident, including, at various points in time, a limited range of motion, an antalgic gait, muscle weakness and a foot drop. That said, given plaintiffs’ claim — and Sethi’s *1315 opinion — that Moat was progressing satisfactorily following the August 2010 surgery, Sethi’s documentation of Moat’s current physical limitations in terms of standing, sitting, walking, driving, working and the like constitutes the sort of objective medical evidence that is sufficient to defeat a motion for summary judgment and place the issue of serious physical injury before a jury.
As for Moat’s cervical spine, despite generalized complaints of neck pain prior to the accident and evidence of a pre-accident “osteophyte protrusion” at the C6-C7 level, which Sethi acknowledged “may have been the result of [a] natural degeneration of [Moat’s] cervical spine,” a January 2011 MRI of Moat’s cervical spine revealed — for the first time — “a large right posterolateral C6-7 disc herniation, with associated C7 nerve root and moderate spinal cord compression.” Sethi was of the view that Moat’s “mild degenerative disc disease of the cervical spine was essentially asymptomatic before the subject accident” and that “the acute herniation of her C6-7 disc” and the problems that flowed therefrom were the direct result of the trauma to Moat’s neck sustained during the course of the November 2010 motor vehicle accident.[5] Although “[p]roof of a herniated disc, without additional objective medical evidence establishing that the accident resulted in significant physical limitations, is not alone sufficient to establish a serious injury” (Pommells v Perez, 4 NY3d 566, 574 [2005]), Moat’s documented loss of strength and decreased range of motion — as set forth in the office records of Sethi and other medical providers — is sufficient to raise a triable issue of fact on this point (see Tandoi v Clarke, 75 AD3d 896, 898-899 [2010]).[6] Defendants’ remaining contentions, including their argument relative to plaintiffs’ economic loss claim, have been examined and found to be lacking in merit.
Lynch, Rose, Clark and Mulvey, JJ., concur.
Ordered that the order is affirmed, with costs.

. Moat, who had smoked on and off since she was a teenager, also suffered from severe asthma, sarcoidosis, fibromyalgia, hypertension, diabetes, a heart murmur, chronic obstructive pulmonary disease and tension headaches.

. As noted previously, Moat did not seek medical attention on the day of the subject accident and, when she presented in a local emergency room the *1312 following day, she primarily was treated for an acute asthma attack. Although Moat’s discharge instructions reflected, among other things, “[c]hronic back pain (with exacerbation),” her review of systems indicated that her neck was “supple,” that her extremities exhibited a normal range of motion, that her pain rating upon discharge was 2 out of 10 and that she was “ambulatory” upon her departure from the hospital.

. Moat also underwent a CT scan of her cervical spine on November 23, 2010, which revealed a “[s]mall right paracentral C6-C7 disc osteophyte protrusion.” According to Sethi, this imaging study “showed that, before her accident of November 16, 2010, [Moat] had some degenerative disc disease of the cervical spine in the form of a small right paracentral disc osteophyte protrusion,” which “may have been the result of [a] natural degeneration of the cervical spine.”

. Moat’s employment records establish that she left her clerical position with her employer on February 5, 2010 — nine months before the accident— “due to her disability” and thereafter received disability benefits. Eleven months after the accident, however, Moat returned to work for the employer— where she remained from October 13, 2011 through December 2012.

. While not determinative, both Sherry and Storrs agreed that there was a disc herniation at the C6-C7 level, and Sherry was of the view that the subsequent cervical spine surgery was causally related to the November 2010 accident. Storrs, although noting a “strong correlation” between the onset of Moat’s cervical spine symptoms and the motor vehicle accident, ultimately concluded that it was “difficult to tell” whether the cited cervical disc herniation “[was] directly related to the motor vehicle accident or [was] preexistent.”

. Sethi attributed the gap between the discovery of the C6-C7 herniation in January 2011 and the surgery to address this condition in May 2013 to Moat’s more pressing lumbar spine issues.